1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAMON HONAKER, | ) Case No. CV 13-8735-JPR |
| Plaintiff, | ) |
| | ) |
| | ) **MEMORANDUM OPINION AND ORDER** |
| vs. | ) **AFFIRMING COMMISSIONER** |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**I.   PROCEEDINGS**

   Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security Income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  This matter is before the Court on the parties' Joint Stipulation, filed July 29, 2014, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed and judgment is entered in her favor.

1

## II.   BACKGROUND

Plaintiff was born on December 15, 1964. (AR 111.) He attended the police academy and completed an associate's degree. (AR 34-35.) He worked as an order clerk and garage-door hanger. (AR 41.) Plaintiff left work to care for his father until his death, in 2002 or 2003. (AR 26-27.) Plaintiff last worked full time in 2000. (AR 26; but see AR 37-38, 124 (last worked in Dec. 1998).)

Plaintiff filed an application for SSI on May 18, 2010. (AR 11, 111-17.) He alleged that he had been unable to work since July 21, 2007, because of "shoulder & joint dislocation," "severe nerve damage in right shoulder," "severe sternum pain," "broken clavicle," "torn tendon and ligaments in right shoulder," "bruised lung," "migraine headaches," "panic attacks," "memory loss," and "loss of strength and mobility of right arm." (AR 111, 124.) After his application was denied, he requested a hearing before an Administrative Law Judge. (AR 67-69.)

A hearing was held on April 4, 2012. (AR 22-46.) Plaintiff, who was represented by counsel, testified, as did a vocational expert. (Id.) In a written decision issued July 13, 2012, the ALJ determined that Plaintiff was not disabled. (AR 9-21.) On September 23, 2013, the Appeals Council denied his request for review. (AR 1-3.) This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.

1  See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra
2  v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial
3  evidence means such evidence as a reasonable person might accept
4  as adequate to support a conclusion.  Richardson, 402 U.S. at
5  401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).
6  It is more than a scintilla but less than a preponderance.
7  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.
8  Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether
9  substantial evidence supports a finding, the reviewing court
10 "must review the administrative record as a whole, weighing both
11 the evidence that supports and the evidence that detracts from
12 the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715,
13 720 (9th Cir. 1996).  "If the evidence can reasonably support
14 either affirming or reversing," the reviewing court "may not
15 substitute its judgment" for that of the Commissioner.  Id. at
16 720-21.

17 **IV.  THE EVALUATION OF DISABILITY**

18    People are "disabled" for purposes of receiving Social
19 Security benefits if they are unable to engage in any substantial
20 gainful activity owing to a physical or mental impairment that is
21 expected to result in death or which has lasted, or is expected
22 to last, for a continuous period of at least 12 months.  42
23 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257
24 (9th Cir. 1992).

25    A.   The Five-Step Evaluation Process
26    The ALJ follows a five-step sequential evaluation process in
27 assessing whether a claimant is disabled.  20 C.F.R.
28 § 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir.

3

1    1995) (as amended Apr. 9, 1996).  In the first step, the
2    Commissioner must determine whether the claimant is currently
3    engaged in substantial gainful activity; if so, the claimant is
4    not disabled and the claim must be denied.  § 416.920(a)(4)(i).
5    If the claimant is not engaged in substantial gainful activity,
6    the second step requires the Commissioner to determine whether
7    the claimant has a "severe" impairment or combination of
8    impairments significantly limiting his ability to do basic work
9    activities; if not, a finding of not disabled is made and the
10   claim must be denied.  § 416.920(a)(4)(ii).  If the claimant has
11   a "severe" impairment or combination of impairments, the third
12   step requires the Commissioner to determine whether the
13   impairment or combination of impairments meets or equals an
14   impairment in the Listing of Impairments ("Listing") set forth at
15   20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is
16   conclusively presumed and benefits are awarded.
17   § 416.920(a)(4)(iii).

18        If the claimant's impairment or combination of impairments
19   does not meet or equal an impairment in the Listing, the fourth
20   step requires the Commissioner to determine whether the claimant
21   has sufficient residual functional capacity ("RFC")[1] to perform
22   his past work; if so, the claimant is not disabled and the claim
23   must be denied.  § 416.920(a)(4)(iv).  The claimant has the
24   burden of proving he is unable to perform past relevant work.
25   Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a

26

27        [1] RFC is what a claimant can do despite existing exertional
28   and nonexertional limitations.  § 416.945; Cooper v. Sullivan, 880
     F.2d 1152, 1155 n.5 (9th Cir. 1989).

prima facie case of disability is established.  Id.  If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing the claimant is not disabled because he can perform other substantial gainful work available in the national economy.  § 416.920(a)(4)(v).  That determination comprises the fifth and final step in the sequential analysis.  § 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 18, 2010, the application date.  (AR 13.)  At step two, the ALJ concluded that Plaintiff had severe impairments of "status post clavicle resection and severe asthma."  (Id.)  At step three, the ALJ determined that Plaintiff's impairments did not meet or equal a Listing.  (AR 13-14.)  At step four, the ALJ found that Plaintiff had the RFC to perform sedentary work[2] but with additional restrictions.  (AR 14.)  Specifically, the ALJ found that Plaintiff could occasionally stoop, kneel, crouch, or crawl, occasionally reach overhead bilaterally, and frequently but not repetitively reach at shoulder level with his right arm; he also should avoid excessive dust, fumes, and smoke.  (Id.)  Based on the VE's testimony, the ALJ determined that Plaintiff was able to perform his past relevant work as an order clerk.  (AR 16.)  Thus, the ALJ found Plaintiff not disabled.  (Id.)

_____

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  § 416.967(a).

**V.   DISCUSSION**

Plaintiff argues that the ALJ erred in assessing his credibility. (J. Stip. at 2.) He does not challenge any of the ALJ's other findings or conclusions.

The ALJ Did Not Err in Assessing Plaintiff's Credibility

Plaintiff contends that the ALJ failed to provide clear and convincing reasons for discrediting his testimony and statements concerning symptoms and limitations attributable to his right upper-extremity impairment and asthma. (J. Stip. at 4.) The ALJ did not err.

1.   Applicable law

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight." See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986). "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks omitted).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d at 1035-36. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036 (internal quotation marks omitted). If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there

is no showing that the impairment can reasonably produce the degree of symptom alleged." <u>Smolen v. Chater</u>, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. <u>See</u> <u>Berry v. Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony.   <u>Lester</u>, 81 F.3d at 834; <u>Ghanim v. Colvin</u>, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014).

In assessing a claimant's credibility, the ALJ may consider (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties. <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir. 2002); <u>Smolen</u>, 80 F.3d at 1284.  If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing."  <u>Thomas</u>, 278 F.3d at 959.

### 2.   Relevant background

In either January or July 2007, Plaintiff sustained a right upper-extremity injury when he was hit by a car while riding either a bicycle or motorcycle. (<u>See</u> AR 27 (Plaintiff testifying accident occurred January 21, 2007), 111 (Plaintiff alleging

onset date of July 21, 2007), 209 (doctor reporting Plaintiff hit while riding bicycle on Jan. 21, 2007), 325 (provider reporting Plaintiff hit by car while riding bicycle), 485 (nurse practitioner reporting Plaintiff hit by car while riding motorcycle).) The record suggests that he had at least three surgeries on his right shoulder, the most recent in May 2011. (See AR 36 (in Apr. 2012, Plaintiff testifying he had had three surgeries), 209 (in 2010, examining doctor noting two surgeries in 2007), 243 (in 2010, treatment notes indicating 2009 surgery), 287 (in 2011, provider noting two previous surgeries), 323 (in 2011, treatment notes indicating Plaintiff had undergone fourth surgical repair for right shoulder injured in car accident).)

In an August 27, 2010 Adult Function Report, Plaintiff stated that his impairments limited his ability to do "[e]verything physical." (AR 133.) He stated that his sleep was affected by severe pain in his shoulder and neck, side cramps, and back pain. (Id.) He stated that he had difficulty dressing, bathing, caring for his hair, shaving, and using the toilet because of severe pain in his shoulder and side cramps. (Id.)

Plaintiff stated that he prepared meals weekly, including sandwiches and frozen dinners, and that food preparation took 10 to 20 minutes. (AR 134.) Because of his impairments, he was unable to lift heavy or large items or sit or stand for a long time. (Id.) He was able to do "basic house work" "off and on" for a few hours but needed help lifting or moving objects and with groceries, laundry, and dishes. (Id.) He attributed his limitations with housework and yardwork to breathing problems, severe shoulder pain, and side pain. (AR 135.)

1    Plaintiff stated that he went outside three times a week,
2  could do so alone, generally rode in a car, and could drive.
3  (Id.)  He shopped for groceries and clothes two or three times a
4  month for two to three hours.  (Id.)  He was able to manage
5  money.  (Id.)

6    Plaintiff stated that his hobbies and interests included
7  bicycling, fishing, shooting, hiking, sports, computers, TV,
8  reading, going to the gym, darts, and other "physical hobbies."
9  (AR 136.)  He said he participated in these activities on
10  weekends and some weekdays and did them "very well."  (Id.)
11  Plaintiff stated, however, that because of his impairments, he
12  suffered panic attacks and feared riding his bike; he also
13  indicated that he was unable to fish, shoot, or do sports, but it
14  was unclear whether he meant only when he suffered panic attacks.
15  (Id.)[3]  He further stated that he suffered headaches when reading
16  and watching TV and pain when using the computer or TV.  (Id.)
17  He said his impairments sometimes made him angry and short with
18  people and caused depression.  (AR 137.)

19    Plaintiff stated that his impairments affected his ability
20  to lift, squat, bend, stand, reach, walk, sit, remember,
21  concentrate, use his hands, and get along with others.  (Id.)  He
22  said he could walk only a block or two before needing to rest for
23  a couple hours.  (Id.)  He could pay attention for only 20 to 30

24

25    [3] Plaintiff has not contested the ALJ's finding that Plaintiff
26  still  hunted,  went  shooting,  and  fished  (AR  14)  despite  his
   somewhat  ambiguous  answers  on  the  Function  Report.   Because
27  Plaintiff  has  not  challenged  that  finding  and  because  it  is
   consistent  with  Plaintiff's  present-tense  answers  on  the  August
28  2010 form (AR 136), the Court accepts it as true.

minutes and did not finish what he started.  (Id.)  He followed
written and spoken instructions fairly well and got along "good"
with authority figures.  (AR 137-38.)  He did not handle stress
well and suffered headaches, nausea, stomach pain, shortness of
breath, and vomiting.  (AR 138.)  He said he sometimes vomited
three or four times a day.  (AR 139.)  He claimed fears of
crossing the street, riding a bike, and cars.  (AR 138.)

Plaintiff's testimony at the April 4, 2012 hearing was
largely consistent with his statements in the Function Report.
He testified that the car accident caused not only his shoulder
injury but also a punctured lung and more trouble breathing from
his asthma.  (AR 27-28.)  He said he had last been prescribed
steroids for asthma treatment in mid-2011.  (AR 30.)  He
testified that he did well on steroids once he had been on them
for three months but still had an asthma attack "every once in a
while" and suffered side effects of drowsiness and increased
appetite.  (AR 31.)  Plaintiff used a nebulizer about three times
a week and still suffered minor asthma attacks three to four
times a week.  (AR 31-32.)  He had last visited the emergency
room for a more serious asthma attack in 2011.[4]  (AR 33.)

Plaintiff testified that he had problems with his right
shoulder and suffered frequent illness and migraines.  (Id.)  He
sometimes suffered nausea with vomiting as many as four times a
week and once suffered "constant vomiting" "the whole day."  (AR
35.)  Plaintiff's doctors had not determined the cause of his
nausea.  (AR 35-36.)  Plaintiff took Tramadol and Robaxin twice a

---

[4] The record does not include documentation of Plaintiff's
alleged 2011 emergency-room visit.

1  day and Vicodin "when the pain gets really bad."[5]  (AR 36.)

2  Plaintiff said it was difficult to steer or shift a car with his

3  right arm.  (AR 36-37.)

4        3.  Analysis

5      The ALJ found Plaintiff's subjective complaints "not fully

6  credible."  (AR 14.)  Indeed, his alleged symptoms and

7  limitations were "out of proportion to the objective clinical

8  findings and observed functional restrictions" in the record.

9  (AR 15.)

10     With respect to Plaintiff's asthma, although the ALJ found

11 evidence of "a recurrent problem of shortness of breath, which

12 occurs continuously," he noted evidence that Plaintiff's

13 breathing problem had "been gradually improving" since its

14 earliest record documentation, in August 2008.  (AR 15; see AR

15 176.)  With the exception of the August 2008 visit to the

16 emergency room, at which a doctor sought to admit him and

17 Plaintiff apparently refused because "he only has problem once 1

18 yr" (AR 179),[6] Plaintiff's treatment records show largely

19

20      [5] Tramadol is used to relieve moderate to moderately severe
21 pain.  See Tramadol, MedlinePlus, http://www.nlm.nih.gov/
   medlineplus/druginfo/meds/a695011.html (last updated Oct. 15,
22 2013).  Robaxin is a brand name for methocarbamol, a muscle
   relaxant.  See Methocarbamol, MedlinePlus, http://www.nlm.nih.gov/
23 medlineplus/druginfo/meds/a682579.html (last updated Oct. 1, 2010).
   Vicodin is the brand name for a combination of acetaminophen and
24 the opioid analgesic hydrocodone, used to relieve moderate to
   severe pain.  See Hydrocodone Combination Products, MedlinePlus,
25 http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html (last
26 updated Oct. 15, 2014).

27      [6] When asked at the hearing about refusing admission against
28 the doctor's advice, Plaintiff said he didn't remember that.  (AR
   29.)

conservative treatment involving regularly scheduled checkups and medication (AR 15 (ALJ noting conservative treatment); see AR 346 (in Jan. 2011, addressing complaints of persistent shortness of breath by continuing Plaintiff's prescriptions and adding "short steroid course to clear up airways"), 334 (in May 2011, noting that seasonal and pet allergies triggered asthma and that Plaintiff had improved with steroids and advising followup visit in one month),[7] 332 (in June 2011, noting improvement with course of steroids, continuing asthma medications, permitting steroid prescription in case of worsened symptoms, and advising return visit in four to five months), 323 (in Oct. 2011, adjusting asthma medication and advising followup visit in five to six months), 384 (in Nov. 2011, continuing asthma medications), 383 (in Feb. 2012, adjusting asthma medications), 494 (in Apr. 2012, noting Plaintiff's complaints of heightened asthma symptoms, prescribing steroids, continuing other asthma medications, recommending return visit in three to four months), 495 (in Apr. 2012, reporting pulmonary-testing results showing "marked improvement" following use of albuterol bronchodilator)).

Thus, although Plaintiff's medical records reflect his consistent reports of asthma symptoms and his providers' regular attention to his breathing issues, other than the August 2008 visit, his treatment notes do not reflect urgent medical needs. Moreover, as the ALJ noted, even at the August 2008 visit,

---

[7] Plaintiff stated that he did not care for any pets (AR 133) but a few months later reported to his doctor that he had a dog and two cats, an allergy to which was determined to trigger asthma symptoms (AR 334).

Plaintiff's chest x-rays showed clear lungs, a normal cardiac
silhouette, and no sign of acute intrathoracic disease.  (AR 15;
see AR 180.)  April 2012 pulmonary-function testing showed
"marked improvement" in Plaintiff's lung function following use
of an albuterol bronchodilator.  (AR 495.)

     That Plaintiff's medical records reflect largely
conservative treatment of his asthma and no urgent visits since
August 2008 was a reasonable basis upon which to discount his
allegations of disabling asthma.  See Parra, 481 F.3d at 751
(noting that "evidence of 'conservative treatment' is sufficient
to discount a claimant's testimony regarding severity of an
impairment"); Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir.
2008) (response to conservative treatment undermines allegations
of disabling impairment); Warre v. Comm'r of Soc. Sec. Admin.,
439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be
controlled effectively with medication are not disabling for the
purpose of determining eligibility for SSI benefits.").
Similarly, that objective diagnostic testing showed no acute
intrathoracic disease and good response to medication was a clear
and convincing reason to discount Plaintiff's allegations to the
contrary.  (See AR 31-32 (Plaintiff testifying he had to use
albuterol repeatedly to achieve results)); see Khanishian v.
Astrue, 238 F. App'x 250, 252 (9th Cir. 2007) (holding that ALJ
properly found claimant's credibility diminished by lack of
objective medical evidence of disability, even when ALJ found
medically determinable impairment); cf. Herrera v. Astrue, No. CV
10-8994-JEM, 2011 WL 4502017, at *4 (C.D. Cal. Sept. 29, 2011)
(upholding ALJ's credibility determination based in part on

                              13

inconsistency between claimant's allegations and objective medical testing).

Plaintiff contends specifically that the ALJ improperly discredited his testimony concerning his chronic asthma. (J. Stip. at 9.) But Plaintiff's testimony did not establish a disabling breathing impairment. Rather, Plaintiff testified that he managed his asthma with a nebulizer and had not required steroid treatment since mid-2011. (AR 30.) He also testified that although he still suffered minor attacks of shortness of breath, he had not had an attack requiring emergency treatment since sometime in 2011 (AR 33), and there is no documentation of the alleged 2011 incident in the record. (See also AR 179 (in Aug. 2008, Plaintiff reporting he had major asthma problems only once a year and had nebulizers at home, "which usually help").) Because Plaintiff's testimony did not establish a disabling asthma impairment but rather suggested that his breathing problems were well managed with prescription medication, the ALJ did not err in discounting Plaintiff's allegations of disabling asthma. Cf. Phetchumporn v. Astrue, No. 1:08-cv-01474-SMS, 2010 WL 716156, at *10 (E.D. Cal. Feb. 26, 2010) (upholding credibility determination based in part on claimant's testimony that symptoms were controlled by medication); Aquirre v. Astrue, No. CV-09-2575-PHX-LOA, 2010 WL 4811787, at *14 (D. Ariz. Nov. 19, 2010) (same).

The ALJ found that Plaintiff's allegations of a disabling right-shoulder impairment were unsupported by the medical evidence and inconsistent with his reported activities. (AR 15-16.) The ALJ noted that Plaintiff had suffered right-shoulder

14

1 acromioclavicular-joint separation and undergone multiple
2 surgeries following his 2007 accident, most recently in May 2011
3 to address acromioclavicular and coracoclavicular instability.[8]
4 (AR 15; see AR 485.)  The ALJ found, however, that aside from the
5 May 2011 surgery, Plaintiff's records reflected "merely
6 conservative and follow up treatment."  (AR 15.)

7     In particular, Plaintiff's May 2011 shoulder surgery appears
8 to have been successful.  (See AR 345 (no apparent issues upon
9 discharge from surgery), 324-28 (Oct. 2011 plan for postsurgical
10 occupational therapy to strengthen right rotator cuff and
11 increase right-shoulder stability).)  And although Plaintiff
12 continued to complain of pain following surgery, he generally
13 reported that his pain had been reduced by the procedure, and his
14 doctors accordingly prescribed conservative treatment, including
15 over-the-counter pain medication and continued activities as
16 tolerated.  (See AR 333 (in May 2011, two weeks after surgery,
17 Plaintiff reporting only "mild pain"), 331 (in June 2011,
18 Plaintiff reporting "pain improved from preop" but "some
19 soreness"), 330 (in July 2011, noting Plaintiff "doing better
20 than pre-op" but with "occasional" pain with shoulder movement
21 and recommending Motrin or Tylenol), 329 (in Sept. 2011, noting
22 Plaintiff's complaints of "sharp" right-shoulder pain with range
23 of motion and referring him for occupational therapy), 497 (in
24

25     [8] The clavicle (collarbone) and scapula (shoulder blade) are
26 connected by the acromioclavicular joint, which is held together
27 primarily by the acromioclavicular and the coracoclavicular
   ligaments.   See Shoulder Separation, MyHealth.Alberta.ca,
28 https://myhealth.alberta.ca/health/Pages/conditions.
   aspx?hwid=tw9147spec (last updated Oct. 29, 2013).

Feb. 2012, Plaintiff reporting "pain better overall than pre-op"
but "still pain & popping" and being advised to continue
activities as tolerated), 499 (in May 2012, Plaintiff "doing
fairly well" except for "popping" three to four times daily,
"usually associated w/ overhead activities"); but see AR 387 (in
Aug. 2011, Plaintiff reporting "constant" right-shoulder pain,
noting application for disability).)  That Plaintiff appears to
have received only conservative care for his right shoulder
between his May 2011 surgery and the hearing was a clear and
convincing basis upon which to discount his complaints of
disabling shoulder pain.  See Parra, 481 F.3d at 751; cf. Ortez
v. Comm'r of Soc. Sec., No. CIV S-10-2096-CMK, 2012 WL 3727136,
at *6 (E.D. Cal. Aug. 24, 2012) (affirming ALJ's credibility
determination based in part on "conservative treatment following
surgery"); Ramirez v. Astrue, No. CV 10-04188 RZ, 2011 WL
1113973, at *2 (C.D. Cal. Mar. 25, 2011) (upholding ALJ's finding
that "residual pain following [back] surgery was treated
conservatively and did not prevent Plaintiff from performing
[sedentary] work").

     Nor did Plaintiff provide evidence that he had a disabling
right-upper-extremity impairment before his May 2011 surgery.  As
the ALJ noted (AR 15), although Plaintiff alleged an onset date
of July 21, 2007, with one exception (AR 199-200), the medical
evidence of shoulder impairment dates from late 2009 and does not
include notes from his pre-2011 upper-right-extremity surgeries.
Medical records predating Plaintiff's May 2011 surgery show that
he complained of right-shoulder pain but that neither Plaintiff
nor his medical providers treated his shoulder impairment as

urgent.  Rather, he was seen primarily for regularly scheduled appointments, and his pain was treated with medication; he was referred for orthopedic evaluation when an MRI showed "small tears" in his rotator cuff.  (See AR 199-200 (in Nov. 2008, noting complaints of sharp pain, "unremarkable" shoulder x-rays, and "good" range of motion; recommending orthopedic consultation, injections, physical therapy, home range-of-motion exercises; "reassur[ing]" Plaintiff that he can "be as active as he needs to be"), 253-54 (in Jan. 2010, noting Dec. 2009 MRI showing tears and referring Plaintiff to orthopedic specialist), 247 (in Apr. 2010, recommending naproxen for pain), 245 (in Apr. 2010, discontinuing naproxen because of gastritis), 242-43 (in May 2010, starting Tramadol and recommending return visit in three months), 284-88, 290 (on visits to orthopedic surgeon between Jan. and Apr. 2011, securing previous records and additional imaging to diagnose right-shoulder issue, ultimately proceeding with surgery); see also AR 210-11 (examining doctor noting "normal alignment and contour" and limited range of motion and recommending light work with additional right-upper-extremity limitations).)  Thus, although the surgery itself was not conservative, that neither Plaintiff nor his medical providers addressed his shoulder impairment with urgency, even in the period before his May 2011 surgery, was a clear and convincing basis to discount his allegations of a disabling shoulder impairment during that period.  See Parra, 481 F.3d at 751;

Tommasetti, 533 F.3d at 1040.[9]

Further, only one of the providers who treated or examined Plaintiff opined that he was disabled by his shoulder impairment, and that statement immediately predated his May 2011 surgery. (See AR 284 (in Apr. 2011, treatment notes indicating Plaintiff scheduled for surgery and describing him as "very debilitated, unable to work").) By contrast, in September 2010, Dr. Edward K. Nomoto, a board-eligible orthopedic surgeon, found that Plaintiff was capable of light work except that he had additional right-arm limitations of lifting and carrying only five pounds occasionally and three pounds frequently and no overhead reaching. (AR 212.) And only immediately following surgery did Plaintiff's medical providers counsel him to limit his upper-right-extremity movement. (See AR 333 (at first postsurgical visit, in May 2011, noting Plaintiff in sling and not permitted weight-bearing activity with right-upper extremity or range-of-motion activities), 330 (in June 2011, noting Plaintiff "in sling, no

_____

[9] The ALJ further noted that despite Plaintiff's claims of significant right-shoulder limitations and inactivity, the record contained "no evidence of severe-disuse muscle atrophy." (AR 15.) The record supports the ALJ's observation of no severe muscle atrophy. (See AR 201-02 (Dec. 2009 report of imaging showing "relatively well developed and symmetric muscular and overall intact tendons"), 210-11 (examining orthopedic surgeon noting "normal alignment and contour" of Plaintiff's shoulders), 287 (provider noting only "slightly [decreased] strength" in right upper extremity), 290 (same).) This finding, however, was not particularly meaningful because Plaintiff did not claim to be unable to perform any activity at all. Compare Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (as amended) (ALJ permissibly discounted claimant's complaint that her pain required her to "lie in a fetal position all day" because she "did not exhibit muscular atrophy or any other physical signs of an inactive, totally incapacitated individual").

ROM" one month after surgery); <u>but see</u> AR 330 (in July 2011,
advising Plaintiff to avoid weight-bearing activities for one
more month but to discontinue sling use), 329 (in Sept. 2011,
referring Plaintiff for occupational therapy upon complaints of
"sharp" right-shoulder pain with range of motion), 324-28 (Oct.
2011 occupational therapy plan), 497 (in Feb. 2012, Plaintiff
reporting "pain better overall than pre-op" but "still pain &
popping" and advised to continue activities as tolerated), 199-
200 (in Nov. 2008, encouraging physical therapy and arm range-
of-motion exercises and "reassur[ing]" Plaintiff that he can "be
as active as he needs to be").  Although one medical provider
prepared a letter summarizing Plaintiff's impairments, she did
not indicate any resultant functional limitations. (<u>See</u> AR 485
(Sept. 2011 letter from nurse practitioner noting Plaintiff's
"history of a right shoulder AC joint separation," "multiple
surgeries performed on his right shoulder," hypertension, and
asthma and his complaints of pain and limited range of motion).)

     It is true, as Plaintiff notes, that an ALJ may not
disregard a claimant's subjective symptom testimony solely
because it is not substantiated affirmatively by objective
medical evidence.  (<u>See</u> J. Stip. at 5-8 (citing <u>Bunnell v.
Sullivan</u>, 947 F.2d 341, 346-47 (9th Cir. 1991))); <u>Robbins</u>, 466
F.3d at 883.  The ALJ may, however, use consistency with the
medical evidence in the record as one factor in the evaluation.
<u>See</u> <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005)
("Although lack of medical evidence cannot form the sole basis
for discounting pain testimony, it is a factor that the ALJ can
consider in his credibility analysis."); <u>Carmickle v. Comm'r Soc.</u>

19

Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction
with the medical record is a sufficient basis for rejecting the
claimant's subjective testimony."); Lingenfelter, 504 F.3d at
1040 (in determining credibility, ALJ may consider "whether the
alleged symptoms are consistent with the medical evidence").
Here, the ALJ properly noted the inconsistencies between
Plaintiff's medical records and his allegations of disabling
asthma and right-upper-extremity impairment in assessing his
credibility.

     The ALJ also found that Plaintiff's daily activities were
"not limited to the extent one would expect, given the complaints
of disabling limitations and symptoms." (AR 14.)  The ALJ noted
that Plaintiff could prepare his own meals, perform basic
housework, shop for groceries and clothes, manage his money, and
engage in bicycling, fishing, shooting, hiking, watching TV,
reading, and physical hobbies on weekends and some weekdays. (AR
14; see AR 136.)  That Plaintiff continued to engage regularly in
a broad range of activities, including some that were physically
demanding, was a clear and convincing basis for discounting his
claims of disabling impairments.  See Tommasetti, 533 F.3d at
1039 (noting that ALJ may consider claimant's daily activities in
assessing his credibility); Mitchell v. Colvin, 584 F. App'x 309,
311 (9th Cir. 2014) (upholding finding that claimant's
allegations of disabling impairments were inconsistent with
reported daily activities, including caring for children,
driving, shopping, and riding bicycle); see also Molina, 674 F.3d
at 1113 ("Even where those activities suggest some difficulty
functioning, they may be grounds for discrediting the claimant's

1  testimony to the extent that they contradict claims of a totally

2  debilitating impairment.").

3      Indeed, although Plaintiff stated that he sometimes feared

4  cycling, his statements suggested that he continued to do it

5  regularly and well, which undermined his claim that his shoulder

6  impairment made it difficult to drive a car.  (See AR 135-36.)

7  Plaintiff's regular cycling, fishing, hunting, and hiking also

8  belied his claims that he could not sit or stand for very long or

9  walk for more than two blocks without a lengthy rest.  (See AR

10 135, 137.)  Moreover, it is unclear how Plaintiff's shoulder

11 impairment and apparently well-managed asthma would interfere

12 with his ability to stand or walk, let alone sit.  Although in

13 January 2011 Plaintiff complained of exacerbated asthma symptoms,

14 including "episodes of [shortness of breath] while walking" (AR

15 346), his treatment notes do not reflect consistent complaints of

16 shortness of breath while walking, he testified at the hearing

17 that he had had no asthma attacks requiring urgent care since the

18 previous year (AR 33), and as discussed above, even in instances

19 in which Plaintiff's asthma was exacerbated, his treatment notes

20 did not reflect that it was treated with urgency or that he was

21 advised to avoid exercise.

22     Thus, the ALJ's finding that Plaintiff's daily activities

23 belied his allegations of disabling impairments must be upheld

24 because it is supported by substantial evidence.  See Burch, 400

25 F.3d at 680-81 (noting that even when evidence of claimant's

26 daily activities "may also admit of an interpretation more

27 favorable to [claimant]," reviewing court "'must uphold the ALJ's

28 decision where the evidence is susceptible to more than one

21

rational interpretation'" (quoting <u>Magallanes v. Bowen</u>, 881 F.2d 747, 750 (9th Cir. 1989))); <u>Thomas</u>, 278 F.3d at 959.

Plaintiff contends that the ALJ did not specify which of Plaintiff's statements he found not credible.  (J. Stip. at 4-5); <u>see</u> <u>Lester</u>, 81 F.3d at 834 (noting that "ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints"); <u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, ___ F.3d ___, 2014 WL 7332774, at *9 (9th Cir. Dec. 24, 2014) (finding that ALJ erred when "he made only the single general statement that 'the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment'"); <u>Martinez v. Colvin</u>, 585 F. App'x 612, 613 (9th Cir. 2014) (reversing when ALJ rejected claimant's testimony "without making *any* credibility determination" and thus failed to "cit[e] what testimony was credible and what testimony undermined [his] complaints"); <u>Burrell v. Colvin</u>, ___ F.3d ___, 2014 WL 7398892, at *3 (9th Cir. Dec. 31, 2014) (ALJ erred in citing claimant's daily activities as basis for rejecting her allegations without "elaborat[ing] on *which* daily activities conflicted with *which* part of Claimant's testimony").  Unlike in <u>Treichler</u>, <u>Martinez</u>, and <u>Burrell</u>, the ALJ pointed to evidence of conservative treatment of Plaintiff's impairments (AR 15), noted the improvement of his asthma over the course of time (<u>id.</u>), outlined the relevant medical evidence undermining his claims (<u>id.</u>), and identified specific activities that were inconsistent with his allegations of disabling impairments (AR 14).  The inconsistencies between Plaintiff's

22

allegations, on the one hand, and his daily activities, conservative treatment, and objective evidence of record, on the other, were proper and sufficiently specific bases for discounting his claims of disabling symptoms, and the ALJ's reasoning was clear and convincing.  See Tommasetti, 533 F.3d at 1039-40; Houghton v. Comm'r Soc. Sec. Admin., 493 F. App'x 843, 845 (9th Cir. 2012).  Because the ALJ's findings were supported by substantial evidence, this Court may not engage in second-guessing.  See Thomas, 278 F.3d at 959.

Remand is not warranted.

**VI.   CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[10] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: January 21, 2015

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[10] This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

23